## IN THE CIRCUIT COURT OF LAWRENCE COUNTY, ARKANSAS
### CIVIL DIVISION

| | | |
|---|---|---|
| **JERE T. JONES and**<br>**TERI JONES** | | **PLAINTIFFS** |
| **v.** | cv-2011-85 | |
| **JPMORGAN CHASE BANK, N.A.**<br>**f/k/a CHASE HOME FINANCE, LLC** | | **DEFENDANT** |

FILED
JUL 20 2011
10:00 AM
Michele Long Circuit Clerk
Lawrence Co., AR

## VERIFIED COMPLAINT AND MOTION FOR
## ORDER FOR TEMPORARY INJUNCTION

Come now the Plaintiffs, Jere T. Jones and Teri Jones (hereinafter referred to as "the Jones' " or "Plaintiffs"), by and through their attorneys, Joel G. Hargis of Crawley, DeLoache & Hargis, PLLC, and Kathy A. Cruz of the Cruz Law Firm, PLC, and for their Complaint against Chase Home Finance, LLC (hereinafter "Chase"), and their Motion for Temporary Restraining Order, state and allege as follows:

### JURISDICTION AND PARTIES

1.      At all time relevant herein, the Plaintiffs have been, and remain residents of the State of Arkansas and are domiciled in Lawrence County.

2.      The property which is the subject matter of this action and is currently the subject of a non-judicial foreclosure under Ark. Code Ann. § 18-50-101, *et seq.* is located at 305 Camie Drive, Walnut Ridge, Lawrence County, Arkansas 72746.

3.      The Defendant, JPMorgan Chase Bank, N.A. upon information and belief merged with Chase Home Finance, LLC in 2011.  They are hereinafter referred to collectively as "Chase."

4.      Upon information and belief, Chase Home Finance, LLC was a Delaware limited liability company with a principal place of business located at 194 Wood Avenue South, Iselin, New Jersey.  Upon information and belief, Chase was not registered to do business in the State of Arkansas, and a check of the Arkansas

1

Secretary of States electronic data base and a check of the Arkansas State Banking Department's list of "Out of State Banks doing Business in Arkansas", last updated on July 12, 2011, shows no registrations for Chase.

5.      Upon information and belief, Defendant JP Morgan Chase was and is a national bank that maintains an office at 270 Park Avenue, New York, NY 10017. Upon information and belief, JP Morgan Chase is not registered to do business in the state of Arkansas, and a check of the Arkansas Secretary of States electronic data base and a check of the Arkansas Banking Commission's list of "Out of state banks holding Certificates of Authority to do business in Arkansas," last updated on January 6, 2011, shows no registrations for JP Morgan Chase.  However, JP Morgan Chase has maintained significant contacts within the State of Arkansas, and is, therefore, subject to both the subject matter and personal jurisdiction of this Court.  Chase Bank may be served by Service of Process upon an out of state bank officer.

6.      All allegations and actions contained herein occurred within the State of Arkansas and Lawrence County.

7.      Jurisdiction and venue are proper for this Court.

## FACTUAL BACKGROUND

**A. The Foreclosure Crisis**

8.      Over the last three years, the United States has been in a foreclosure crisis. A congressional oversight panel has recently noted that one in eight mortgages in the United States is currently in foreclosure or default.[1]

9.      In testimony before the United States Senate Subcommittee on Administrative Oversight and the Courts of the Committee on the Judiciary on July 23, 2009, Alys Cohen of the National Consumer Law Center testified as follows:

---

[1] Congressional Oversight Panel, Oct. 9, 2009 report at 3.  Available at:
1 http://cop.senate.gov/reports/library/report100909-cop.cfin.

> Goldman Sachs estimates that, starting at the end of the last quarter of 2008 through 2014, 13 million foreclosures will be started.  The Center for Responsible Lending, based on industry data, predicts 2.4 million foreclosures in 2009, and a total of 9 million foreclosures between 2009 and 2012.  At the end of the first quarter of 2009, more than 2 million homes were in foreclosure. Over twelve percent of all mortgages had payments past due or were in foreclosure and over seven percent were seriously delinquent – either in foreclosure or more than three months delinquent.  Realtytrac recently reported an additional 300,000 homes go into foreclosure every month.  These spiraling foreclosures weaken the entire economy and devastate the communities in which they are concentrated.  Neighbors lose equity; crime increases; tax revenue shrinks.

("Cohen Testimony,")[2]

## B. Arkansas Statutory Foreclosure Act ACA §§ 18-50-101- et seq.

10.     Arkansas Code Annotated § 18-50-101 et. seq. (hereinafter referred to as "the ASFA") was enacted by the Arkansas General Assembly (hereinafter referred to as "the General Assembly") enacted the ASFA in order to "provide an *efficient* and *fair* procedure for the liquidation of defaulted mortgage loans to the benefit of both the homeowner and the mortgage lender." (Emphasis added) (Acts 1987, No. 53, § 19: Feb. 18, 1987; Emergency Clause).

11.     The AFSA, as enacted and modified from time to time by the General Assembly, contains requirements that must be met in order for a mortgagee to avail themselves of the right to employ the AFSA.

12.     Pertinent to the instant case, ACA §§ 18-50-116 and 117[3] requires that any entity employing the use of the ASFA to foreclose on property in this state be a "mortgagee or beneficiary [who] is a mortgage company as defined in § 18-50-

---

[2] Available online at:
http://www.consumerlaw.org/issues/mortgage_servicing/content/Testimony-Worsening_forecl_072309.pdf.

[3] The requirements of these two statutes must be read together in order for them to have any intelligible effect on the ASFA.

101[4] or is a bank or savings and loan" and that it be "authorized to do business in this state."

13.     As to ACA § 18-50-117, specifically, pursuant to the emergency clause of Acts 2003, No. 1303, § 3: Apr. 14, 2003, the General Assembly found that, "foreign entities not authorized to do business in the State of Arkansas are availing themselves to the provisions of the Statutory Foreclosure Act of 1987; that often times it is to the detriment of Arkansas citizens; and that this act is immediately necessary because these entities should be authorized to do business in the State of Arkansas before being able to use the Statutory Foreclosure Act of 1987."

14.     Pursuant to ACA § 18-50-116(d)(2)(A)(B)(ii) nothing in this chapter shall be construed to impair the right of any person or entity to assert his or her legal and equitable rights in a court of competent jurisdiction.

15.     If the mortgagor fails to raise his or her legal or equitable rights in a court of competent jurisdiction before the sale of the property, then the mortgagor will waive such right or defense to the sale.  However, the General Assembly added specific protections provided to the mortgagor to protect his property interest should the mortgagee or trustee fail to properly execute a foreclosure sale pursuant to the ASFA.  While ACA § 18-50-116 provides for the waiver of any defenses that the mortgagor could have raised prior to the foreclosure sale, it allows for the assertion of the following claims:

> § 18-50-116(d)(2)(b)(i) Fraud; or (ii) Failure to *strictly comply* with the provisions of this chapter, including without limitation subsection (c) of this section.

(Emphasis added).

---

[4] Pursuant to ACA § 18-50-101(1) and (6), a beneficiary is "a person named or otherwise designated in a deed of trust as the person for whose benefit a deed of trust is given or his successor in interest," and a mortgage is "the person holding an interest in real property as security for the performance of an obligation or his or her attorney-in-fact appointed pursuant to this chapter."

16.     Moreover, because the ASFA, abrogates the common law and allows for the taking of property without judicial oversight, the Arkansas Supreme Court, discussing the ASFA, held that, "Any statute which is in derogation of or at variance with the common law must be strictly construed." *Henson v. Fleet Mortg. Co.*, 319 Ark. 491, 497 (Ark. 1995).

17.     Additionally, ACA § 18-50-116 specifically states that only banks, mortgage companies, and savings and loans can avail themselves of the procedures in ACA § 18-50-101 et seq., ACA 18-50-117 requires any entity availing itself of the procedures in ACA 18-50-101 et seq. to also be registered to do business in this state.  As national banks are not regulated by the state of Arkansas, and the WINGO act excuses from registration those engaged in writing mortgages, there is no way to read ACA § 18-50-117 with ACA § 18-50-116 and to give full meaning to ACA § 18-50-117 since the only entities allowed to proceed pursuant to ACA § 18-50-116 are mortgage companies, banks and savings and loans, and those entities are excluded from registration to do business in this state via the National Banking Act and the WINGO act when conducting banking activities.

18.     However, notwithstanding the above, the United States Supreme Court made clear in *Watters v. Wachovia Bank, N.A.*, 550 U.S. 1, 12, 127 S. Ct. 1559 (2007) that "national banks are subject to state laws of general application in the daily business, to the extent that such laws do not conflict with the letter or the general purpose of the NBA [National Banking Act]." *Bate v. Wells Fargo Bank, N.A.* (In re Bate), 2011 Bankr. LEXIS 2293, 9-10 (Bankr. M.D. Florida, June 22, 2011). (See the *Bate* case attached hereto as Plaintiff's Exhibit "A" and incorporated herein by this reference.)

19.     Assuming arguendo that foreclosure is a banking act, which Plaintiff's emphatically deny, pursuant to the United States Supreme Court's case law, Arkansas' non-judicial foreclosure statutes, specifically ACA § 18-50-117, does not

impermissibly regulate national banks.  In fact, twenty-three (23) states in the union do not even allow non-judicial foreclosures.

20.     This issue has not yet been resolved by the Arkansas Supreme Court. Until the Arkansas Supreme Court rules on this issue, ACA § 18-50-117 has to be given its full meaning.  Therefore Fannie Mae, by virtue of the fact that it is not authorized to do business in the State of Arkansas, it is, therefore, not authorized to proceed with a non-judicial foreclosure pursuant to ACA § 18-50-101 et seq.

21.     At no time relevant to this action and the foreclosure giving rise thereto has Chase been authorized to do business in this state; and, therefore, they cannot avail themselves to the provisions of ACA § 18-50-101 et seq.

## C. The Plaintiffs' Loan

22.     The Plaintiffs originally purchased their home located at 305 Camie Drive, Walnut Ridge, Arkansas 72476 on April 18, 2007.

23.     The note was secured by a mortgage of even date therewith, naming The Mortgage Source, Inc. as the lender.

24.     An Assignment of Mortgage was filed on May 3, 2007 by The Mortgage Source, Inc. assigning JP Morgan Chase Bank, NA all its rights, title, interest in and to a certain mortgage stated herein.

25.     Sometime around the end of 2008 and the beginning of 2009, the Debtors fell behind on their mortgage due to unforeseen financial problems that were made further complicated when Mr. Jones lost his job at Razorback Concrete after the ice storm of 2009.

26.     In fact, during this time and over the next two years, Mrs. Jones was in constant contact with Chase in an attempt to rehabilitate the Plaintiff's mortgage account and save their home.  As evidenced by the attached affidavit, not only did Chase not assist the Plaintiff's in their endeavor to save their home; but actually ignored the Plaintiff's, gave them conflicting advise and actually contributed to the

size of the arrearage now claimed against their mortgage account. (See the Affidavit of Teri Jones attached hereto as Plaintiff's Exhibit "B" and incorporated herein by this reference.)

27.     As of the date of this complaint, Plaintiffs' home is set to sale on July 25, 2011.

28.     Plaintiffs affirmatively state that Chase has failed to implement practices and procedures to help in the effective servicing of mortgage accounts, and that such failure has directly lead to the wrongful foreclosure of the Plaintiffs' home.

29.     If the Defendants are allowed to proceed pursuant to ACA § 18-50-101 et seq., and the Plaintiffs' interest in their homestead is foreclosed, they will suffer irreparable harm, and be forced to vacate their residence. The costs of any appeal would be beyond the Plaintiffs ability to pay as Plaintiffs could be required to post a bond to appeal if Plaintiffs' interest in their residence is foreclosed.

30.     Finally, pursuant to ACA § 18-50-103, which was amended this year and taking effect on July 1, 2011, any mortgagee or beneficiary moving to foreclose under the non-judicial foreclosure acts must provide to the mortgagor and grantor the following documents and information:

ACA §18-50-103(2)(A)(ii)(B) and (C):

(ii) At least ten (10) days before initiating the foreclosure has provided by standard mail to the grantor, mortgagor, or obligor at the address of the property encumbered by the mortgage or deed of trust or the mailing address of the grantor, mortgagor, or obligor:

(a) A true and correct copy of the note with 1 all required endorsements, the mortgage, or the deed of trust;

(b) The name of the holder and the physical location of the original note;

(c) A true and correct copy of the original mortgage or deed of trust and if in the possession of the beneficiary or mortgagee, each assignment or allonge of the mortgage or deed of trust;

(d) Information, including the applicable telephone number and Internet address, regarding the availability to the grantor, mortgagor, or obligor of each program for loan modification assistance or forbearance assistance offered:

    (1) Solely by the beneficiary or the mortgagee; or

    (2) By a government agency if the beneficiary or mortgagee participates in the government agency's program; and

(e) If the default is the result of the failure to make payment, a payment history showing the date of default.

(B) If a true and correct copy of the original note, mortgage, deed of trust, or an assignment or allonge of the note, mortgage, or deed of trust is lost or otherwise unavailable, the beneficiary or mortgagee may instead of providing true and correct copies of the note, mortgage, deed of trust, or assignment or allonge of the note, mortgage, or deed of trust, provide a statement that the document is lost or otherwise unavailable, and shall recite the good faith efforts the beneficiary or mortgagee has made to locate the document.

(C) The duties of the beneficiary or mortgagee to provide information under subdivision (2) of this section are not delegable to the beneficiary's trustee or the mortgagee's attorney-in-fact.

31.    As of the date of this Complaint and Motion for a Temporary Restraining Order, which is well within the ten (10) days requirement period, the Plaintiff's have not received the information required in ACA § 18-50-103.  As such, this sale is not in strict compliance with the ACA § 18-50-101 *et seq.* which renders the sale void under Arkansas Supreme Court case law quoted above from the *Henson* case.

### COUNT ONE ACA § 16-50-101 *et seq.* UNAVAILABLE: DECLARATORY JUDGMENT THAT THE SALE IS VOID FOR FAILURE TO STRICTLY COMPLY WITH THE PROVISIONS OF ACA §§ 18-50-116 and 117

32.    Plaintiffs repeat and re-allege the allegations above as if set forth herein word for word.

33.    As stated above, Arkansas Code Annotated § 18-50-101 et. seq. was enacted by the General Assembly in order to "provide an *efficient* and *fair* procedure for

the liquidation of defaulted mortgage loans to the benefit of both the homeowner and the mortgage lender." (Emphasis added) (Acts 1987, No. 53, § 19: Feb. 18, 1987; Emergency Clause).

34.     The ASFA, as enacted and modified from time to time by the General Assembly, contains requirements that must be met in order for a purported mortgagee to avail themselves of the right to employ the ASFA.

35.     Pertinent to the instant case, ACA §§ 18-50-116 and 117[5] requires that any entity employing the use of the ASFA to foreclose on property in this state be a "mortgagee or beneficiary is a mortgage company as defined in § 18-50-101[6] or is a bank or savings and loan" and that it be "authorized to do business in this state."

36.     As to ACA § 18-50-117, specifically, pursuant to the emergency clause of Acts 2003, No. 1303, § 3: Apr. 14, 2003, the General Assembly found that, "foreign entities not authorized to do business in the State of Arkansas are availing themselves to the provisions of the Statutory Foreclosure Act of 1987; that often times it is to the detriment of Arkansas citizens; and that this act is immediately necessary because these entities should be authorized to do business in the State of Arkansas before being able to use the Statutory Foreclosure Act of 1987."

37.     Upon information and belief, Chase is not registered to do business in the state of Arkansas, and a check of the Arkansas Secretary of States electronic data base and a check of the Arkansas Banking Commission's list of "Out of state banks holding Certificates of Authority to do business in Arkansas," last updated on May 31, 2011, shows no registrations for Chase.

---

[5] The requirements of these two statutes must be read together in order for them to have any intelligible effect on the ASFA.

[6] Pursuant to ACA § 18-50-101(1) and (6), a beneficiary is "a person named or otherwise designated in a deed of trust is the person for whose benefit a deed of trust is given or his successor in interest," and a mortgagee is "the person holding an interest in real property as security for the performance of an obligation or his or her attorney-in-fact appointed pursuant to this chapter."

38.      Additionally, ACA § 18-50-103, as quoted above, specifically requires certain detailed documentation and information be sent to the Plaintiff's at least ten (10) days prior to the sale of the Plaintiff's property.

39.      Based on the foregoing, the non-judicial sale initiated by Chase is void under Arkansas law and cannot be allowed to move forward.

## COUNT TWO
## MOTION FOR TEMPORARY INJUNCTION

40.      Plaintiffs repeat and re-alleges the allegations above as if set forth herein word for word.

41.      Chase's threatened foreclosure sale of Plaintiffs' home that is to take place on July 25, 2011, will irreparably harm Plaintiff because it will cause the loss of their home.

42.      Upon information and belief, Plaintiffs believe that they will prevail in a trial on the merits in this case.

43.      Based on the foregoing, the Court should enter an Order enjoining Chase from going forward with the foreclosure sale of Plaintiffs' home in order that a trial on the merits may be had.

44.      Pursuant to Arkansas Rule of Civil Procedure Rule 65 and based on their herein verified complaint and the Affidavit of Mrs. Jones, Plaintiffs specifically request a restraining order be put in place until such time as this Court or any of the named defendants requests a hearing on the same.

45.      Plaintiffs demand a jury trial.

46.      Plaintiffs reserve the right, and fully expect, to amend this pleading after a complete review of Chase's response to the Plaintiff's Qualified Written Request sent to Chase pursuant to the Real Estate Settlement Procedures Act has been performed and if other facts or claims come to light during discovery.

WHEREFORE, premises considered, Plaintiffs respectfully pray as follows:

10

A. That the Defendants be temporarily enjoined from conducting a foreclosure sale of the Plaintiff's home on July 25, 2011, until a trial on the merits of this case is had and the determination of the parties rights are determined including whether Chase has authority to proceed pursuant to ACA § 18-50-101 *et seq*;

B. Should this Court determine that the Defendants are not entitled to precede under the ASFA, that a Declaratory Judgment be entered permanently preventing Defendants from employing the use of the same;

C. That the Plaintiffs have and recover from the Defendants an award of compensatory damages in an amount determined by this Court;

D. That the Plaintiffs have and recover from the Defendants an award of punitive damages in an amount determined by this Court;

E. That the Plaintiffs have and recover an amount from the Defendant for their attorney's fees and costs incurred herein pursuant to ACA § 16-22-308; and,

F. For all other relief which this Court deems just and proper.

Respectfully submitted,
John Smith and Donna Smith,
Defendants

By: _____
Joel G. Hargis
Arkansas Bar #2004-007
Crawley, DeLoache & Hargis, PLLC
533 West Washington
Jonesboro, AR 72401
(870) 972-1127 (PH)
(870) 972-1787 (FX)
joel@crawleydeloache.com

By: _____
Kathy Cruz
Arkansas Bar #87079
Cruz Law Firm
1325 Central Ave.
Hot Springs, AR 71901
(501) 624-3600 (PH)
(501) 624-1150 (FX)
kathycruzlaw@gmail.com

11

## VERIFICATION OF COMPLAINT

I, Jere T. Jones, having read the foregoing Complaint do swear and affirm that the facts as presented are true and correct to the best of my knowledge and affix my signature hereto as a testament thereof.

Dated this ___19___ day of July, 2011.

Plaintiff: _____
Jere T. Jones

I, Teri Jones, having read the foregoing Complaint do swear and affirm that the facts as presented are true and correct to the best of my knowledge and affix my signature hereto as a testament thereof.

Dated this ___19___ day of July, 2011.

Plaintiff: _____
Teri Jones

STATE OF ARKANSAS   )
                    )
COUNTY OF CRAIGHEAD )

SUBSCRIBED AND SWORN to before me, a Notary Public, this ___19___ day of July, 2011.

My Commission Expires:___6-11-2016___

_____
NOTARY PUBLIC

CHARIS R. LANGSTON
NOTARY
PUBLIC
#12348093
EXPIRES
6-11-2016
CRAIGHEAD COUNTY, AR



**In re: Opal V. Bate, Debtor.  Opal V. Bate, Plaintiff, vs. Wells Fargo Bank, N.A., Defendant.**

**Case No. 8:10-18159-MGW, Chapter 7, Adv. Pro. No.: 8:10-ap-01289-MGW**

**UNITED STATES BANKRUPTCY COURT FOR THE MIDDLE DISTRICT OF FLORIDA, TAMPA DIVISION**

*2011 Bankr. LEXIS 2293*

**June 22, 2011, Decided**

**COUNSEL:** [*1] For Opal V Bate, Debtor (8:10-bk-18159-MGW): Robert M Geller, Law Offices of Robert M. Geller, P.A., Tampa, FL.

Trustee (8:10-bk-18159-MGW): Lauren P. Greene, Seminole, FL.

For Opal V Bate, Plaintiff (8:10-ap-01289-MGW): Robert M Geller, LEAD ATTORNEY, Law Offices of Robert M. Geller, P.A., Tampa, FL.

For Wells Fargo Bank, N.A., Defendant (8:10-ap-01289-MGW): Fentrice D Driskell, Carlton Fields, P.A., Tampa, FL.

**JUDGES:** Michael G. Williamson, United States Bankruptcy Judge.

**OPINION BY:** Michael G. Williamson

**OPINION**

**MEMORANDUM OPINION ON PREEMPTION BY NATIONAL BANK ACT OF FLORIDA CONSUMER COLLECTION PRACTICES ACT**

The National Bank Act[1] preempts state laws that prevent or significantly interfere with the exercise by national banks of their powers. The Florida Consumer Collection Practices Act[2] applies generally to all creditors and prohibits inappropriate debt collection practices. It does not prevent or significantly interfere with the business of banking. Accordingly, for the reasons set forth below, the Court concludes that the NBA does not preempt the FCCPA.

1  *12 U.S.C. § 1, et seq.* ("NBA").
2  *Fla. Stat. § 559.55 et seq.* ("FCCPA").

Procedural Background

This adversary proceeding was brought by the debtor, Opal Bate ("Debtor"), [*2] against Wells Fargo Bank, N.A. ("Wells Fargo") seeking damages for violation of the automatic stay under *Bankruptcy Code Section 362* and for violations of the FCCPA. Specifically, Count I of Debtor's Complaint alleges that Wells Fargo's loan collection activities violated the automatic stay pursuant to *11 U.S.C. § 362(a)(6)*. The remaining thirty-five counts of the Complaint are based on alleged violations of the FCCPA. Thirty-three of these counts allege that Wells Fargo violated *Section 559.72(18), Florida Statutes*, by contacting the Debtor after it had knowledge that she was represented by an attorney. In this regard, each of these counts contains the following identical paragraphs:

> That Defendant, Wells Fargo, had knowledge that Plaintiff, Opal Bate, was represented by counsel with respect to the debt and had knowledge of Plaintiff's attorney's name and contact information.[1]
>
> That the continued communication with Plaintiff, Opal Bate, in an attempt to collect a debt, constitutes a direct violation of *Florida Statute § 559.72(18)*.[1]



**EXHIBIT**

**A**

3  *See, e.g.,* Complaint at ¶ 68 (Doc. No. 1).

4  *See, e.g.,* Complaint at ¶ 69 (Doc. No. 1

In two additional counts, the Debtor alleges that Wells Fargo violated [*3] *section 559.72(17)* by impermissibly contacting the Debtor after 9:00 p.m. and before 8:00 a.m. in attempts to collect the past-due balance on her mortgage loan and that Wells Fargo violated *Section 559.72(7)* by repeatedly contacting the Debtor in a harassing manner.

Wells Fargo moved to dismiss the Complaint. It argued that the Debtor's allegations in Count I of the Complaint, that Wells Fargo violated the automatic stay, are insufficient to state a claim for relief. It also claimed that the other thirty-five counts of the Complaint that are based on the FCCPA should be dismissed on the basis that the NBA preempts state laws such as the FCCPA that would otherwise limit the manner and scope by which national banks may service and conduct collection activity with respect to loans made in the course of their banking business. A pre-trial conference was held on January 18, 2011, where the Court considered the Motion to Dismiss and denied the Motion as to Count I.⁵ Therefore, the sole issue before this Court is whether the NBA preempts the FCCPA.

5  Doc. No. 14.

Conclusions of Law

The Court has jurisdiction over this adversary proceeding pursuant to *28 U.S.C. § 1334(b).* This is a core proceeding [*4] pursuant to *28 U.S.C. § 157(b)(2)(O).*

The issue before this Court is whether the NBA preempts the FCCPA. In its Motion to Dismiss, Wells Fargo relies on regulations promulgated by the Office of the Comptroller of the Currency (the "OCC") that clarify the applicability of state law to national banks.⁶ Under the relevant federal regulations, state laws that "obstruct, impair, or condition a national bank's ability to fully exercise its Federally authorized ... lending powers do not apply to national banks."⁷ These regulations also specify certain state laws dealing with subjects that are not viewed as being inconsistent with the real estate lending powers of national banks and apply to national banks to the extent that they only incidentally affect the exercise of national banks' real estate lending powers.⁸

6  *12 C.F.R. § 7.4008.*

7  *12 C.F.R. § 7.4008(d)(1); 12 C.F.R. § 34.4(a).* *See* Preemption Final Rule, 23 No. 1 OCC Q.J. 28 (2004) (available at 2004 WL 2360325), at *11-13.

8  *12 C.F.R. § 7.4008(e); 12 C.F.R. § 34.4(b).*

The specific areas that are not generally preempted are: contracts, torts, criminal law, rights to collect debts, acquisition and transfer of real property, taxation, zoning, and any [*5] other law the effect of which the OCC determines to be incidental to the lending functions of the national bank.⁹ While the inclusion within these non-preempted areas of the "rights to collect debts"¹⁰ could be interpreted to support the view that debt collection activities of a national bank do not fall within the scope of the federal preemption, the OCC's interpretive history of the applicable regulations dealing with this issue indicates otherwise.¹¹ That is, it is clear from this history that the reference in these regulations to the "rights to collect debts" pertains to the "existence of a bank's *right* to recover a debt, not to the means the bank uses to pursue that right."¹² Because the "means" employed by a bank to collect a debt would necessarily bring into play laws limiting the manner in which creditors can collect debts, such as the FCCPA, the OCC's interpretation of its own regulation would support a finding that the NBA preempts the FCCPA and its provisions would not apply to national banks.

9  *12 C.F.R. § 7.4008(e)(1)-(8); 12 C.F.R. § 34.4(b)(1)-(8).*

10  *12 C.F.R. § 7.4008(e)(4); 12 C.F.R. § 34.4(b)(5).*

11  *Preemption Final Rule,* 23 No. 1 OCC Q.J. 28 (2004) (available at 2004 WL 2360325), [*6] at *16; OCC Interpretive Letter # 1082, at 6.

12  OCC Interpretive Letter # 1082, at 6 (emphasis in original).

Accordingly, it appears then that if the sole guidance for this Court were the preemption regulation and the OCC's interpretive letter, then it would be appropriate to find preemption. But this is not the case when the Court looks to the general principles governing federal preemption and the deference that should be afforded to an agency's proclamation that state debt collection laws are preempted.

A. Federal Preemption

The Supremacy Clause of Article VI of the Constitution provides that the laws of the United States "shall be the supreme Law of the Land; ... any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."¹³ In considering preemption issues under the *Supremacy Clause,* we start with the assumption that "the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress."¹⁴ The presumption against preemption applies even in those areas long occupied by federal regulation, and the purpose of Con-

gress is the ultimate touchstone in every preemption case.[15]

   13  *U.S. Const. art. VI, cl. 2.*
   14  *Cliff v. Payco Gen. Am. Credits, Inc., 363 F.3d 1113, 1122 (11th Cir. 2004).*
   15  *Wyeth v. Levine, 555 U.S. 555, 129 S. Ct. 1187, 1194-95, 173 L. Ed. 2d 51 (2009)* [*7] (declining to accept the argument that the presumption against preemption does not apply because the Federal Government has regulated drug labeling for more than a century).

Congress's intent to preempt state law may be explicitly stated in the language of a federal statute or it may be implicitly contained in the structure and purpose of the statute.[16] The Supreme Court has identified three types of preemption: express preemption, field preemption, and conflict preemption.[17] Express preemption occurs when Congress has clearly expressed an intention to preempt state law.[18] Field preemption occurs when federal regulation in a legislative field is so pervasive that it can reasonably be inferred that Congress left no room for states to supplement it.[19] Conflict preemption arises under two circumstances. The first circumstance is when it is physically impossible to comply with both federal and state law.[20] This has been referred to as "physical impossibility preemption."[21] The second circumstance is when state law stands as an obstacle to achieving the objectives of the federal law.[22] This type has been referred to as "obstacle preemption."[23]

   16  *Cliff, 363 F.3d at 1122.*
   17  *Id.*
   18  *Id.*
   19  *Id.*
   20  *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta, 458 U.S. 141, 153, 102 S. Ct. 3014, 73 L. Ed. 2d 664 (1982);* [*8] *Fla. Lime & Avocado Growers, Inc. v. Paul, 373 U.S. 132, 142-43, 83 S. Ct. 1210, 10 L. Ed. 2d 248 (1963).*
   21  *Wyeth, 129 S. Ct. at 1209.*
   22  *Barnett Bank of Marion Cnty., N.A. v. Nelson, 517 U.S. 25, 33, 116 S. Ct. 1103, 134 L. Ed. 2d 237 (1996); De la Cuesta, 458 U.S. at 153.*
   23  *Anderson v. Sara Lee Corp., 508 F.3d 181, 192 (4th Cir. 2007).*

## 1. Express Preemption

In 1819, in the case of *McCulloch v. Maryland*,[24] the Supreme Court held that federal law is supreme over state law with respect to national banking. In 1864, Congress enacted the National Bank Act establishing the system of national banking still in place today.[25] The Act vested in nationally chartered banks enumerated powers

and "all such incidental powers as shall be necessary to carry on the business of banking."[26] It also vested the OCC with broad rulemaking authority under *12 U.S.C. §§ 93(a) and 371(a).*[27] The NBA however, does not contain a provision preempting state consumer protection laws. It only contains a provision that requires notice and an opportunity for comment before the OCC issues an opinion letter or interpretive rule concluding that federal law preempts state laws concerning, among other things, consumer protection.[28] Therefore, express preemption is not applicable to this case because [*9] Congress, through the NBA, has not clearly expressed its intent to preempt state consumer protection laws.

   24  *17 U.S. 316, 4 L. Ed. 579 (1819).*
   25  *Watters v. Wachovia Bank, N.A., 550 U.S. 1, 11, 127 S. Ct. 1559, 167 L. Ed. 2d 389 (2007).*
   26  *12 U.S.C. § 24 Seventh.*
   27  Under *12 U.S.C. § 371*, any national banking association may, "make, ... loans or extensions of credit secured by liens on interests in real estate, subject to ... such restrictions and requirements as the Comptroller of the Currency may prescribe by regulation or order."
   28  *See 12 U.S.C. § 43.* The notice and opportunity for comment is also required for state laws concerning community reinvestment, fair lending, or the establishment of intrastate branches.

## 2. Field Preemption

Field preemption is also inapplicable to this case. While Congress did not expressly address the NBA's preemption of state laws, it has been an issue since its enactment, and the Supreme Court has repeatedly made clear that federal law shields national banks from unduly burdensome and duplicative state regulation.[29] However, the Supreme Court has also made clear that national banks are subject to state laws of general application in their daily business, to the extent such laws do not conflict with the letter [*10] or the general purposes of the NBA.[30] States are permitted to regulate the activity of national banks where doing so does not prevent or significantly interfere with national banks' efficient exercise of any power enumerated under the NBA.[31] Based on the foregoing, this Court is persuaded that Congress did not intend for the NBA or the OCC regulations to occupy the field of national banking to the exclusion of state laws of general application and, therefore, field preemption does not apply.

   29  *Watters, 550 U.S. at 13-14.*
   30  *Id. at 12.*
   31  *Id.* (citing *Barnett, 517 U.S. at 32-34*).

## 3. Conflict Preemption

Having concluded that the NBA does not expressly preempt the FCCPA and that the NBA does not occupy the entire field of laws governing the lending activities of national banks, we now turn our attention to conflict preemption. This part of the preemption analysis presents a more challenging task because the conflict in this case is not between a federal statute and state law, but between an agency's interpretation of its own regulation and state law.

An agency regulation with the force of law may preempt state law.[32] Whether a federal regulation bears the force of law to preempt state law depends [*11] on whether Congress has authorized the agency to preempt state law directly.[33] In such cases, the Supreme Court has consistently held that federal regulations have no less preemptive effect than federal statutes[34] and "the Court has performed its own conflict determination, relying on the substance of state and federal law and not on agency proclamations of pre-emption."[35] As discussed earlier, Congress has authorized the OCC to make determinations on the preemption of state consumer protection laws. Therefore, the OCC's regulation has the force of law, and this Court is to perform its own conflict determination, relying on the substance of state and federal law.

32   Wyeth, 129 S. Ct. at 1200-01.
33   Id.
34   See, e.g., Hillsborough Cnty., Fla. v. Automated Med. Lab., Inc., 471 U.S. 707, 713, 105 S. Ct. 2371, 85 L. Ed. 2d 714 (1985); De la Cuesta, 458 U.S. at 153.
35   Wyeth, 129 S. Ct. at 1201.

As discussed earlier, there are two types of conflict preemption: 1) physical impossibility preemption; and 2) obstacle preemption. First of all, it would not be physically impossible to comply with the NBA and with the FCCPA, as the statutes are not in direct conflict with each other.[36] Therefore we are only left to consider obstacle preemption. [*12] Before discussing obstacle preemption, we will address Wells Fargo's argument that the FCCPA conflicts with the express language of the OCC's regulation.

36   An example of statutes in direct conflict is if the federal law said, "you must sell insurance." while the state law said, "you may not." Barnett, 517 U.S. at 31. The NBA does not give instruction to national banks on the process of debt collection.

The OCC regulation at issue does not specifically refer to state debt collection laws, and to the knowledge of this Court, the OCC has never interpreted its regulations to mean that the debt collection process is included in the

servicing of a loan such that national banks are free from any restrictions such as state debt collection laws.[37] Wells Fargo relies on the OCC regulations to argue that the FCCPA is preempted by the NBA because it "obstruct[s], impair[s] or condition[s] a national bank's ability to fully exercise its Federally authorized ... lending powers"[38] by restricting Wells Fargo's ability to service and participate in its mortgage agreement with the Debtor.[39] However, the plain language of 12 C.F.R. § 7.4008(d)(2) provides that national banks "may make non-real estate loans [*13] without regard to state law limitations concerning" among other things, "[t]he terms of credit," including "balance, payments due," "the circumstances under which a loan may be called due," and "[d]isbursement and repayments."[40] Nothing in the FCCPA states that Wells Fargo cannot make non-real estate loans; it only requires that national banks, as well as all other debt collectors in Florida, abide by the FCCPA when attempting to collect debts. Therefore, 12 C.F.R. § 7.4008 does not "expressly" preempt the FCCPA.

37   But see Lomax v. Bank of Am., N.A., 435 B.R. 362, 371 (N.D. W. Va. 2010) (finding that a West Virginia statute prohibiting a debt collector from communicating with a consumer when it appears that he is represented by an attorney is preempted by the NBA because "restricting to whom [a bank] may communicate regarding its mortgage loans implicates the 'processing, origination, servicing, sale or purchase of, or investment or participation in, mortgages' by national banks").
38   See 12 C.F.R. § 7.4008(d).
39   Motion to Dismiss at 6-10 (Doc. No. 9)
40   12 C.F.R. § 7.4008(d)(2)(iv) and (ix) (emphasis added).

Wells Fargo also contends that the FCCPA is not saved by the OCC regulation's savings [*14] clause because as interpreted by the OCC in its interpretive letter, the savings clause's reference to "right to collect debts" is different from the means by which a bank collects its debts.[41] In other words, state laws regarding national banks' rights to collect debts are not preempted, but state laws regarding debt collection are. The question for this Court then is what level of deference do we give to the OCC's interpretation of its regulation?

41   Motion to Dismiss at 10-11 (Doc. No. 9); see also 12 C.F.R. § 7.4008(e); OCC Interpretive Letter # 1082, at 6.

When dealing with the level of deference to be accorded to agency action, case law has developed two levels of deference. The first and higher level of deference is known as "Chevron" deference based on the Su-

preme Court case of *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*,[42] This level of deference is given "when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority."[43] In such cases, the regulation is binding in the courts unless procedurally defective, [*15] arbitrary or capricious in substance, or manifestly contrary to the statute.[44] The second, and lower deference, is known as "*Skidmore* deference" based on the Supreme Court case of *Skidmore v. Swift & Co.*[45] Under this standard, the level of deference accorded to an agency's action depends on the "the thoroughness evident in [the agency's] consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade."[46]

42    *467 U.S. 837, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984).*

43    *U.S. v. Mead Corp., 533 U.S. 218, 226-27, 121 S. Ct. 2164, 150 L. Ed. 2d 292 (2001).*

44    *Id.*

45    *323 U.S. 134, 65 S. Ct. 161, 89 L. Ed. 124 (1944).*

46    *Skidmore, 323 U.S. at 140.* While not controlling in this case, it is noteworthy that *Skidmore* level deference has been incorporated in the new Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank"). *12 U.S.C. § 25b(b)(5)(A).*

Wells Fargo argues that the OCC's interpretive letter should be given *Chevron* deference in accordance with the Supreme Court case of *Auer v. Robbins*.[47] In *Auer* the Supreme Court held that an agency's interpretation of its own regulation is entitled to *Chevron* deference.[48] In that case, the Secretary of Labor was given authority to define and delimit the scope [*16] of exemption for executive, administrative and professional employees.[49] The Secretary of Labor promulgated a regulation that created a salary-basis test.[50] It later interpreted the test in an *amicus* brief.[51] The Supreme Court held that "because the salary-basis test is a creature of the Secretary's own regulations, his interpretation of it is, under our jurisprudence, controlling 'unless plainly erroneous or inconsistent with the regulation.'"[52] This case is distinguishable from *Auer*. While the OCC has been given authority to make determinations on the preemption of consumer protection laws, its regulations relevant to this case are not of its own creation, but a codification of "principles of NBA conflict preemption that had percolated through the federal courts over several decades."[53] In its Preemption Final Rule, the OCC stated that the initial proposal for the regulations proposed that "debt collection" be included in the list of state laws generally not pre-empted.[54] It later changed this to "right to collect debts" to be consistent with the Supreme Court case of *National Bank v. Commonwealth*.[55] Therefore, the OCC's interpretive letter should not be given *Chevron* deference.

47    *519 U.S. 452, 117 S. Ct. 905, 137 L. Ed. 2d 79 (1997).*

48    *Auer, 519 U.S. at 457;* [*17] *Christensen v. Harris Cnty., 529 U.S. 576, 588, 120 S. Ct. 1655, 146 L. Ed. 2d 621 (2000).*

49    *Auer, 519 U.S. at 456.*

50    *Id.*

51    *Id. at 461.*

52    *Id.*

53    *Smith v. BAC Homes Loans Serv., LP, 2011 U.S. Dist. LEXIS 26104, 2011 WL 843937 at *8 (S.D. W. Va. Mar. 11, 2011).*

54    *See* Preemption Final Rule, 23 No. 1 OCC Q.J. 28 (2004) (available at 2004 WL 2360325), at *15.

55    *76 U.S. 353, 19 L. Ed. 701 (1869); see* Preemption Final Rule, 23 No. 1 OCC Q.J. 28 (2004) (available at 2004 WL 2360325), at *15 n.60.

When an agency is administering its own regulation, the courts have accorded *Skidmore* deference to the agency action; and the level of deference depends on the "degree of the agency's care, its consistency, formality, and relative expertness, and to the persuasiveness of the agency's position."[56] This Court recognizes that an agency has "a unique understanding of the statutes they administer and an attendant ability to make informed determinations about how state requirements may pose an 'obstacle to the accomplishment and execution of the full purposes and objectives of Congress,'" but the issue here is one of preemption, and we do not defer to agency positions, whether formal or informal, on preemption issues because a preemption determination involves matters more within the expertise [*18] of the courts than within the expertise of the agency.[57] This is especially so when the agency is interpreting Supreme Court precedent, rather than its own regulations, does not conduct its own conflict analysis, and provides no significant reasons as to why it has distinguished "rights to collect debts" from the means by which a bank pursues that right. Also, the OCC's interpretive letter was not subject to notice and an opportunity for comment as required by *12 U.S.C. § 43*, and it is far from clear that the OCC was making a preemption determination of state debt collection laws in its letter.[58] Therefore, no deference will be given to the OCC's interpretive letter beyond its explanation that the source of the term "right to collect debts" is *National Bank*.

56   *Mead, 533 U.S. 218, 228, 121 S. Ct. 2164, 150 L. Ed. 2d 292* (citing *Skidmore, 323 U.S. at 140*).

57   *Bankwest Inc. v. Baker, 411 F.3d 1289, 1300-01 (11th Cir. 2005)* (citing *Smiley v. Citibank (South Dakota), 517 U.S. 735, 744, 116 S. Ct. 1730, 135 L. Ed. 2d 25 (1996)*); *see also Nat'l Min. Ass'n v. Sec'y of Labor, 153 F.3d 1264, 1266 (11th Cir. 1998)* (finding that courts do not need to give deference to issues beyond an agency's expertise); *Wyeth, 129 S. Ct. at 1201* (agency conclusions regarding preemption [*19] are not entitled to deference).

58   The OCC's interpretive letter addresses banks' overdraft practices, and the OCC's comments regarding a bank's "right to collect debts" versus its debt collection activity are contained in a footnote, rather than in the substance of the letter. *See* OCC Interpretive Letter # 1082, at 6 n.12.

Indeed, the OCC is correct that *National Bank* expressly uses the phrase, "right to collect their debts," but the OCC did not quote the next sentence in the Supreme Court's opinion, which states: "It is only when the State law *incapacitates* the banks from discharging their duties to the government that it becomes unconstitutional."[59] In the many years that follow, the Supreme Court never changes this view. This is witnessed in the more recent Supreme Court case on NBA preemption, *Barnett Bank of Marion County, N.A. v. Nelson.*[60]

59   *National Bank, 76 U.S. at 362* (emphasis added).
60   *517 U.S. at 33.*

The Supreme Court first articulated the view that states may regulate national banks so long as doing so "does not prevent or significantly interfere with the exercise by the national bank of its powers" in *Barnett.*[61] The case of *Barnett* involved a statute that was enacted by Congress [*20] that granted certain national banks the authority to sell insurance in small towns.[62] Subsequently, Florida enacted a statute that prohibited certain banks from selling most kinds of insurance.[63] After determining that express, field, and physical impossibility preemption did not apply, the Supreme Court discussed obstacle preemption.[64] The Supreme Court looked to the purpose of the federal statute to determine if the state statute stood as an obstacle to that purpose.[65] The Court noted that historically, the interpretations of grants of both enumerated and incidental powers to national banks have been grants of authority not normally limited by, but rather ordinarily preempting, contrary state law.[66] Importantly, the Court found that states may regulate national banks so long as doing so does not prevent or significantly interfere with national banks' exercise of

their powers.[67] Ultimately, the Court looked to the intent of Congress and held that the state law was preempted by the NBA because there was no indication that Congress intended to subject the national banks' power to sell insurance to state restriction.[68]

61   *Id.* This standard is carried over explicitly in Dodd-Frank. Dodd-Frank, [*21] § 5136C(b)(1)(B). However, Dodd-Frank does not apply to this case because the actions underlying the Debtor's case predate the effective date of Dodd-Frank. *See 75 FR 57252-02*, 2010 WL 3616738 (F.R.). Additionally, it does not appear that Dodd-Frank applies to State debt collection laws because by its terms, it refers to "state consumer financial laws." *12 U.S.C. §25b(b)(1).* A State consumer financial law is "a State law that does not directly or indirectly discriminate against national banks and that directly and specifically regulates the manner, content, or terms and conditions of any financial transaction ... or any account related thereto, with respect to a consumer. *12 U.S.C. § 25b(a)(2).* State debt collection laws do not directly and specifically regulate the manner, content, or terms and conditions of national banks' mortgages and loans. They prohibit certain practices specifically regarding debt collection.
62   *Barnett, 517 U.S. at 28.*
63   *Id.*
64   *Id.* at 30-32.
65   *Id.* at 31.
66   *Id.* at 32.
67   *Id.* at 33.
68   *Id.* at 35-37.

The *Barnett* standard was subsequently applied by the Supreme Court in *Watters v. Wachovia,*[69] a case in which the Supreme Court was faced with the question of whether a national [*22] bank's operating subsidiaries are subject to state licensing and auditing agencies.[70] The OCC had promulgated a regulation providing that state law applies to national bank operating subsidiaries to the same extent that those laws apply to parent national banks.[71] This basically preempted the applicability of state laws regarding licensing and auditing agencies to national bank operating subsidiaries. The petitioner in the matter disputed the OCC's promulgation of the regulation and argued that preemption is a legal question for determination by the courts.[72] The Supreme Court disregarded this argument stating that the OCC regulation merely clarified and confirmed what the NBA already conveyed and again looked to the intent of Congress and the purpose of the NBA to make its preemption determination.[73]

69   *550 U.S. at 12.*
70   *Watters, 550 U.S. at 7.*
71   *Id. at 14* (citing *12 C.F.R. § 7.4006*).
72   *Id. at 20.*
73   *Id. at 21.*

In its discussion, the Court stated that: "Federally chartered banks are subject to state laws of general application in their daily business to the extent that such laws do not conflict with the letter or the general purposes of the NBA."[74] The Court also rearticulated the conflict [*23] preemption standard set forth in *Barnett*, that "[s]tates are permitted to regulate the activity of national banks where doing so does not prevent or significantly interfere with the national bank's ... exercise of its powers."[75] The Court held that the NBA did preempt the application of certain Michigan laws to national bank operating subsidiaries because they significantly interfered with the business of banking by subjecting national bank operating subsidiaries to multiple audits and surveillance.[76]

74   *Id. at 11.* The Supreme Court also provided some examples of state laws that national banks are subject to, such as state usury laws and state contract law. *Id.*
75   *Id. at 12.*
76   *Id. at 21.*

Both of the state laws at issue in *Barnett* and *Watters* directly affected a national bank's exercise of its powers. The Supreme Court in both cases recognized the fact that states do have the ability to regulate national banks, and it focused its preemption analysis on whether the state law prevented or significantly interfered with the national bank's exercise of its powers under the NBA, which is consistent with the Supreme Court's statement in *National Bank*.

B. Does the FCCPA Prevent or Significantly Interfere [*24] with National Banks' Exercise of Their Powers under the NBA?

This then brings us to the last part of the conflict analysis. That is, does the FCCPA stand as an obstacle to achieving the objectives of the NBA? Or, as applied to the NBA, does the FCCPA prevent or significantly interfere with a national bank's exercise of its powers?[77] In addressing this issue, it is helpful to review the historical development of the laws relating to creditors' "rights to collect debts" since that term was used by the Supreme Court in *National Bank* in 1869.

77   *Barnett, 517 U.S. at 33; Watters, 550 U.S. at 12.*

Following World War II there was an explosion of consumer credit in the United States.[78] With an increase in debts, consumers were faced with the problem of how to pay their debts, and creditors were faced with the problem of how to collect their money. This led to a corresponding problem of an increase in third-party debt collectors representing numerous types of creditors: "hospitals, general retailers, credit unions, colleges, department stores, utilities, banks, commercial or wholesale accounts, medical clinics, and newspapers."[79] The techniques used by creditors and third-party debt collectors [*25] ranged from friendly coercion to blatant harassment.[80]

78   Moss, David A., *The Rise of Consumer Bankr.: Evolution, Revolution, or Both?*, 73 Am. Bankr. L.J. 311, 328-29 (1999). "Total consumer credit rose from $8.338 billion in 1940 to $56.161 billion in 1960, and then to $157.582 billion in February 1973." Connolly, John M., *Recent Statutes Regulating Debt Collection, or Nunc, De Minimus Curat Lex,* 14 B.C. Indus. & Com. L. Rev. 1274, 1275 n.11 (1972-1973).
79   *Fair Debt Collection Act: Hearing on H.R. 29 Before the Subcomm. on Consumer Affairs of the House Comm. on Banking, Finance, and Urban Affairs*, 95th Cong., 1st Sess. 156-57 Act: (1977).
80   *Carroll, William Richard, Debt Collection Practices: The Need for Comprehensive Legislation,* 15 Duq. L. Rev. 97, 98 (1976-1977) (providing examples of collection harassment, which include: "the use of letters and forms resembling legal notices and court orders; letters and phone calls threatening legal action or the use of physical force; visits and phone calls at inconvenient hours to the debtor, or his friends and relatives; contact with employers asking assistance in collecting the debt; and impersonation of attorneys and legal officers"); *see also* [*26] Connolly, *supra* note 78, at 1274 nn.1-6 (providing a list of collection tactics from different cases).

Debtors who were abused by outrageous debt collection practices were left to common-law tort remedies.[a] There has never been a question that the NBA does not preempt such typical common law tort remedies. However, these were for the most part inadequate to redress conduct that, although outrageous, did not fit within any of the traditional common-law tort remedies.[a] Due to the increase in debt collection abuses and the inadequacy of the common-law tort remedies, in the late 60's and early 70's, the states recognized the need for consumer protection legislation in the area of debt collection. Most states enacted consumer protection laws aimed at debt collection practices.[a] In Florida the FCCPA was enacted in

1972 to address these very concerns.[44] In addition, because the state laws were not always effective, especially when collectors made contact with consumers over state lines,[45] Congress also saw a need for legislation in the area and enacted the Fair Debt Collection Practices Act ("FDCPA") in 1978.

81  Salt, Terry Jayne, *Fair Debt Collection Practices: Analysis of Fla. and Fed.* [*27] *Law*, 30 U. Fla. L. R. 892, 894 (1977-1978). Consumers relied on tort theories such as, "defamation, intentional interference with contractual relations, malicious prosecution, abuse of process, invasion of privacy, trespass, false imprisonment, and assault and battery." *Id.* at n.26; *see also* Hurt, Charles E., *Debt Collection Torts*, 67 W. Va. L. Rev. 201 (1964-1965).

82  Salt, *supra* note 81, at 894 (discussing the harsh burden of proof requirements and nonexistence of general standard of reasonable conduct within traditional tort remedies).

83  In 1977, a congressional study noted that only thirty-seven states and the District of Columbia had laws regulating debt collectors. H.R. Rep. No. 95-131, at 3 (1977). Of the thirty-eight, only a small number had significant prohibited practices and provide consumers with a private right of remedy. *Id.* Thirteen states had no debt collection laws, and eleven other states had few or no prohibited practices. *Id.*

84  *See, e.g., Harris v. Beneficial Finance Co. of Jacksonville*, 338 So.2d 196, 200-01 (Fla. 1976) ("The [FCCPA] is a laudable legislative attempt to curb ... a series of abuses in the area of debtor-creditor relations").

85  H.R. Rep. No. 95-131, at [*28] 2-3 (1977) (stating that interstate debt collection is a major lawless area and that state laws cannot regulate this area).

It is noteworthy that the FDCPA does not preempt state laws dealing with debt collection and provides that state laws are not inconsistent if they provide the consumer more protection than the federal law.[46] However, the FDCPA does not apply to collection activity by the actual creditor as opposed to a debt collection agency.[47] In this respect, the FCCPA complements the FDCPA by offering protection to consumers where the actual creditor, as opposed to a debt collection agency, is attempting to collect a debt.[48] Importantly, it is a law of general applicability and applies to all creditors, not just national banks.

86  *See 15 U.S.C. § 1692n.*

87  *See 15 U.S.C. § 1692a. See also* Schulman, David A., *The Effectiveness of the Fed. Fair Debt Collection Practices Act (FDCPA)*, 2 Bankr. Dev. J. 171, 173 n.19 (1985) (stating that extreme abuses are sometimes not remedied because the FDCPA does not apply to banks, credit unions, loan companies, retailers, and private individuals collecting debts).

88  *See Fla. Stat. § 559.72* (providing that "[i]n collecting consumer debts, *no person* [*29] shall ...") (emphasis added).

Wells Fargo argues that the FCCPA affects national banks' lending powers under the NBA because it "restricts the frequency, procedure, and substance of contacts that are permitted between Wells Fargo and its customers regarding customers' loans."[89] This Court disagrees. The NBA was designed to prevent "[d]iverse and duplicative superintendence of national banks' engagement in the business of banking."[90] The FCCPA has no effect on the "business of banking" as conducted by national banks. Its effect is on the business of debt collection as conducted by creditors in general, not just national banks.

89  Motion to Dismiss at 7 (Doc. No. 9).
90  *Watters, 550 U.S. at 13-14.*

There is no significant regulatory objective that would merit preempting a state law of general applicability that is designed to protect consumers from unscrupulous and egregious activity by debt collectors. The FCCPA may restrict the frequency, procedure, and substance of contacts permitted between Wells Fargo and its customers, but it only does so to the extent of requiring that such collection contacts not be abusive, deceptive or unfair. Wells Fargo may still make loans. It may also collect [*30] on those loans, but it must abide by the FCCPA when doing so, just as every other debt collector in Florida must do. Therefore, the FCCPA does not prevent or significantly interfere with Wells Fargo's exercise of its powers under the NBA. Accordingly, the NBA does not preempt the FCCPA.

For the above reasons, this Court concludes that Wells Fargo's Motion to Dismiss shall be denied by separate order.

**DATED** in Chambers at Tampa, Florida, on June 22, 2011.

/s/ Michael G. Williamson

Michael G. Williamson

United States Bankruptcy Judge

## IN THE CIRCUIT COURT OF LAWRENCE COUNTY, ARKANSAS
## CIVIL DIVISION

**JERE T. JONES and**                                          **PLAINTIFFS**
**TERI JONES**

**V.**                            **CV-**_____

**CHASE HOME FINANCE, LLC; and**                              **DEFENDANTS**
**JPMORGAN CHASE BANK, N.A.**

### <u>AFFIDAVIT OF TERI JONES</u>

I, Teri Jones, for purposes of this affidavit state as follows:

In January 2009, we got hit with an ice storm followed by 2 months of rain, which left my husband out of work for 4 months with no pay. My husband was working for Razorback Concrete at this time and due to the weather, there was no work. We were already behind on a couple of payments so when the ice storm hit, due to lack of work, we went into foreclosure. I have been trying to work with Chase for two and a half years to bring this up to date. Too many times to count I would call only to find the next time I talked to one of their representatives, I would find out that I had gotten the wrong information. I kept a record of when I talked to them and what was said:

August 28, 2009 – Called, talked to Greg. He told me that my account had been approved for government help. Then talked to Rachael and she said that they cannot put attorney's fees back into the loan. So they are requesting the amount due and will work out a payment plan. Once that is paid, then they will work out the plan for the mortgage payment. Was told to not send any mortgage payments, they could not accept them while I was under foreclosure. Call back next week. Called the mortgage attorney and our account was placed on hold so no sale date as of now. Talked to Trent.

August 30, 2009 – I received a letter from the insurance company saying that our insurance was canceled because the owner was not living in home. Called them to say we are living here and got a letter from the mortgage company saying that the home was not sold. Talked to April.

September 25, 2009 – Called the mortgage company and talked to Shemeka. Then talked to Juanita. Their computers were down. Could not look anything up.

October 4, 2009 – I called the mortgage company and talked to Nichole. I called to check in. Needed updated paystubs, bank statements and home insurance. Faxed those in.



EXHIBIT

B

November 6, 2009 – Called to check in. I have been sick so I could not call sooner. Resent info to them.

December 15, 2009 – Per their request by phone call, I faxed in the current paystubs. Found out our negotiator is Suzette Elston.

December 24, 2009 – Called mortgage company, Suzette not in office.

December 28, 2009 – Called Suzette back, left message. Told what bills come out of my check.

January 4, 2010 – left message to Suzette called operator to see if she left notes for me. Raina said account opened under my income only so can not use Jere's income even though he is in the home and we use all his income on monthly bills.

January 22, 2010 – Nicole, sent to another rep her computer is down. Having trouble with their phone lines will call back later.

February 5, 2010 – left message

February 9, 2010 – called to check in talked to Ahmed. No update.

February 26, 2010 – suzette left message needs me to fax check stubs and what comes out of my check. Which is only the housepayment and my $15.00 credti card payment and $75.00 of a phone bill. Jere is responsible for all the other monthly bills.

April 16, 2010 – Left message.

May 7, 2010 – try to call left message for Suzette and was on hold for 24 minutes never did pick up.

May 26, 2010 – Loan given to Sarah. Faxed her check stubs.

June 4, 2010 – received denial letter. Said debts to high.

June 7, 2010 – was told to send another letter request and pay stubs.

June 17, 2010 – called to see what was going on with account. Talked to Heather was pre-approved for modifying mortgage. She also told me that afer to modify was approved I would be set up on a repayment plan to get caught up. Do not send in your mtg payments now.

June 22, 2010 – talked to Ken. Gave him all of my info again. Told him that I was told we could not use Jere's income and he said we will use some of it. Didn't really understand that. I told him how could they use off of our debts, but not use his income. He said he would work it out. So after he figured out the difference, he added $200.00 of Jere's income to make a surplus of 125.57. Again I was told not to send any mortgage payments at this time because account is under foreclosure. Was told this would take 2 to 3 weeks to get assigned to someone and then we would

make plans to send payments. Should be 3 to 6 months and this would be all taken care of.

August 22, 2010 – Sent mod papers again for 3rd or 4th time.

July 28, 2010 – talked to Adam. Having system problems.

August 2, 2010 – need to send bank statements from bank they said they cant use the ones you get off the computer on line. Talked to Carl Graham.

September 27, 2010 – Ryan called 2 times when I was able to back talked to Carla she said she would leave a note for him to call me back.

December 2, 2010 – called to check on account. Faxed over paper work again.

January 24, 2010 – Katherine... Faxed everything again signed and dated everything. Person I talked to on the 12/2/10 told me I could white out the old dates on the paperwork I had sent before and write the new date on it. This did not seem right to me. I questioned her 3 times over this and she said it was perfectly ok and would be accepted. Katherine was shocked she had told me this and said no it would not be. I expressed to her that I have gotten wrong information several times that I have called. It was very frustrating. I faxed her that papers again.

April 14, 2011 – Marsha said I was denied because of debt but there was no code for the reason on their computer. Talked to Devon said this means they aren't to give me any details on the reason. They still won't use Jere's income but they want to include all of our debts under just my income.

I have really to tried to work this out with Chase. I have done everything they have asked me to do. At first they would deny me saying paperwork was not filled out right, but no one would help me with it. Finally, I got someone to go step by step over the pone to show me what I was doing wrong. Then Jere's income became the issue. I still do not understand how they can use all of our family debts but only use my income. No one ever gave me a reason for this. I also asked man many times if I could please send in mortgage payments. Every time, I was told No they would not accept payment while I was under foreclosure.

Further, I, the affiant, sayeth naught.

Executed this day:

_Teri Jones_
Teri Jones

_7-19-11_
Date

**In Witness Whereof**, I have hereunto set my hand and seal this _19_ day of _____, 2011.

Notary: _Charis R. Langston_

My Comission Expires: _06-11-2016_